Please rise. This court is now in session. You may be seated. The clerk will call the next case. 3-15-05-15. People of the State of Illinois. Appellee by Laura DeMichael Highland v. Stephen Corlett. Corlett, appellant by Samuel Snyder. Mr. Snyder, you may proceed. May it please the court, counsel, my name is Sam Snyder. I represent the defendant appellant in this case. This case arose out of Curia County, case number 14 CF-169, aggravated DUI. If I could begin by giving a little bit of background. On September 28th of the year 2013, a defendant was operating a motor vehicle that ran in the back of a motorcycle. The driver of the motorcycle flew off the bike and then later died of his injuries that were sustained as a result of that accident. Charges of aggravated DUI were filed against the defendant. And the two counts that proceeded to trial, one was a charge of aggravated DUI for impairment, and the other, which is the subject of the litigation that's before the court today, deals with subsection A-6 and also D-1F, all part of the same charge, which was aggravated DUI based on the allegation of per se liability for DUI for a controlled substance in blood, urine, or breath. The defendant was acquitted of the impairment charge but was convicted after the bench trial of that second charge under A-6. The subject matter of this appeal focuses on the testimony of the State's sole witness in regards to subsection A-6, the per se controlled substance aggravated DUI charge. That would purport to show that there was the presence of a controlled substance in the defendant's blood or urine, namely the substance known as aproxalam, which is commonly known as Xanax. And I've asked the courts, I beg the pardon of the court if I mispronounce some of these words. I'm not a pharmacist, so I'll do the best I can. I know I did. Maybe the others, too, as we're reading them. Yes, they are technical. Would it help from your brief if you just called it Xanax? And, you know, maybe that's A-K-A? Well, as the court may or may not know, I entered my appearance last week. Yeah, I know. You're not briefed, are you? But what I'm going to try to do is sort of simplify that by using one-word names of the different things I'm going to talk about, including the technical tests that were done. For example, the gas chromatograph, I'll just call it the gas test. And then there's the liquid chromatograph with mass spectrometry. I'll call that the liquid test, for example. But as part of the State's investigation, the State procured one bottle of defendant's urine and then one tube of his blood, which was later submitted for analysis at the State Crime Lab in Springfield. That was tested by the State's chemist, who later appeared at trial for the State. That was chemist Ms. Paiva. In regards to her initial testing, we'll focus on the urine. That was what was tested first. And it's my understanding that she first conducted a gas chromatograph, or gas test, in order to analyze defendant's urine for the presence of ethanol. That's not an issue here. She later then employed what was known as an EMIT test. I believe the exact name is Enzyme Immunoassays, I believe is the pronunciation, but it's also known as an EMIT test, E-M-I-T. What that does is it's a screening test that determines broadly what category of controlled substance we're talking about. For example, benzodiazepine, cocaine, amphetamines, and there's different types of amphetamines. Basically, to summarize it, it's a test to see whether or not there are controlled substances exist in either urine or blood, correct? That's correct. Okay, and then to identify if any, which they are. Yeah, then to identify. That's what we're really dealing with here. And so what did they find in the urine? According to Ms. Piva's testimony, she could not testify within a reasonable degree of scientific certainty that this controlled substance to which Mr. Corlett was convicted, alcohazolam or Xanax, was actually present. What they did find was what the state argues is, and conceitedly, or I'll concede that the expert did say that it was a metabolite of that substance, but what she later testified to is that it could be a metabolite of other substances. So it may or may not have been a byproduct, and if the court understands how this works, at least my understanding, is say a controlled substance like Xanax is consumed or ingested, then it metabolizes, it goes through a chemical process, and then spits out what's called a byproduct known as a metabolite. Now, there are substances presumably that produce certain metabolites, but sometimes metabolites can be the product of other substances which may or may not be controlled substances. And what I've gathered from the testimony of the state's sole witness to this issue on this charge is that that byproduct, which she initially said must have come from Xanax, actually may or may not have come from Xanax. And then when the defense put on their expert, this Dr. O'Donnell, he stated that he knows of substances that it could, or at least one substance other than Xanax that it could have been. And what is not clear from the record is whether that's even a Schedule I, II, III, or IV controlled substance, in which case it may not have been illegal at all, and that goes to the issue of whether there is even sufficient evidence to prove him guilty of aggravated DUI. So, to the degree of medical certainty, you're saying the state chemist could not say that this metabolite came into existence or is a substance that is derived from Xanax. Yes, that's correct. Okay, and that you have another chemist, qualified as an expert I presume, is that correct? Yes, sir. Who says that it could be, it could not be. That's correct. That's the state of the science regarding this test? Well, he couldn't state within a reasonable degree of science. So you have nothing to a reasonable degree of medical certainty? No, sir. Is what your argument is? Essentially, yes. Okay. The other part of my argument is this, though. But that's only in urine, isn't it? That's only urine, but then this is where it gets a little hairy. Okay. So she does this test for urine, and she conducts the gas test, which is supposed to identify or qualify what substance we're dealing with. Later they do a test to quantify, or quantitate is what the terminology she uses. So the way I'm looking at it, if I could use an analogy, it's sort of like the last test, the liquid test, as we call it, which was admittedly an experimental test, which I believe from the record is off the manual. In other words, that the state crime lab technician did not follow the proper protocol, was using something that they hadn't used before, who stated that she believed that it had been used in other settings but couldn't state in her testimony where that might have been, and also admitted, I believe it was redirect, that it was no longer used at their crime lab because, and that quote is contained in the record, of its experimental nature and it hadn't been, quote, validated. Okay. But to get back to my other point, that liquid test was to quantify. But the problem is this, is that she bases the quantification test on the assumption that there was already Xanax in the system. And see, that urine test that I spoke of, the gas chromatograph, the gas test, didn't say for sure if that, all it found was a metabolite. A metabolite of what might have been Xanax, but it might have been something else that may not have even been a controlled substance. So they aren't part and parcel of each other. They're separate. It's apples and oranges. And if we go to the liquid test, all that does, it's like a kitchen scale. It weighs the apple for the orange. Well, we've got the statement to be fair is that it can't be excluded, but it can't be verified. Or established either. That's right. Yeah, that's correct. And so the quantification test says, whatever it is, this is the amount. It can tell you how much of the apple or orange you put on a scale. Whatever it is, this is the amount. Right. Okay. And this is a strict liability problem. Yes, sir. So it doesn't matter whether it's a trace or it's a large quantity. If it exists, it's a violation. That's correct. But then we also have another issue, too, and whether we even have a trace. And so that is also an issue. And it's my understanding that the testimony was from the state's chemist, Ms. Paiva, that she said that it could be an amount less than 12.5 micrograms, which, to give you perspective, that's one one-thousandth of a milligram. So we're talking tiny, tiny, tiny, tiny. And according to the defense's expert, it was within the margin of error. So all she could state with certainty, with scientific certainty, is that it was an amount less than 12.5, which could be zero. And so that's another issue, too. So we have a metabolite, which may or may not be from a controlled substance. We weigh it, and we don't even know if we have an actual trace amount, as the court just suggested, or nothing. And so that goes to two issues of the three issues that were raised. Well, really all three, but mainly the foundation aspect of the chemist's testimony, and then also whether there's sufficient evidence to prove this man guilty, beyond a reasonable doubt, based on really the only evidence that they have to support that claim, which is Ms. Paiva's testimony. There are a couple of cases I'd ask the court to consider. I don't know if this case was briefed at all, but there's a case called Hasselbring, I believe. It's People v. Hasselbring, and I'll give the citation. It's 2014, ILAP, 4th, 131, 128. And that's an interesting one, because that deals with metabolites. It's actually the same subsection of the DUI code that was prosecuted in this case, subsection A6 and D1F. So it was the mere presence of a controlled substance. In that case, they were dealing with cocaine. And what eventually happened is that the defendant's conviction was affirmed on appeal, because the state's expert on cross-examination stated that the metabolite that was found in that person's specimen could only have come from cocaine. But that's distinguishable from the case here, which we have experts saying it could have come from someplace else. One expert, the state's expert, says it could have. And then the defense expert's saying it may have. We know that there is a substance, whereas she just acknowledged that there could be, but wasn't sure. So that raises that issue into major doubt. And when you look at that case, that was how they found this gentleman guilty. Because how else could they have, what other substance could it have come from? Here we don't have that. We also don't have an admission, which some of the cases where there's a fault, say that when there's some kind of faulty testing, you can also go to whether there are admissions or whatnot from the defendant. That's not present in this case either. Those aren't the facts of this case. In fact, it's my understanding that the persons that arrived on the scene testified in the first day of the trial that they had no reason to believe that this gentleman was under the influence of any sort of drug or alcohol and there were no admissions to that effect. That's my understanding. That's correct. But he didn't, in other words, he didn't provide any independent corroboration by his own admission that he had ingested the substance, which would get around, perhaps, faulty testing. But when you have a case such as this where that is all their evidence, that is it, that's Ms. Piva's testimony, the testing of the vial of urine and blood, and we can't even show that this metabolite for sure came from this controlled substance or to even say that it was even a trace amount, it could have been zero, then I don't see how the state prevails. And so that's essentially my argument. Thank you, Mr. Stein. Thank you. Mr. Michael Bailon. May it please the court? Counsel? Lord Michael Bailon. Before you get started, were you familiar with this case? Hasselberg? No, I'm not familiar with it. If you'd like, we'd like to give you some time to respond to it. Since it wasn't decided in the briefs, as far as I know. If defense counsel did a motion to add authority, then the people would respond to it. Counsel, did you do that? Was that filed? Probably not, since you're not here. You'll be given 14 days to file a motion, and then you'll have 14 days to respond to it. Sounds good. So the issue here is whether there was sufficient evidence that there was L-Prazolam in defendant's blood. The urine is really a red herring in this case because the controlled substance just has to be in the blood, breath, or urine. And here the people weren't arguing that the urine test showed with scientific certainty that there was L-Prazolam in it. There was this metabolite. The forensic toxicologist believed that it could have come from L-Prazolam. But regardless of what happened with the urine, the test of the blood showed L-Prazolam. It didn't show a different molecule that could have metabolized to the hydroxyl L-Prazolam. It showed L-Prazolam because that's what the machine was set up to look for. And we know that the test done on the blood was reliable because the test itself included performance checks. There were six standards of blood that were spiked with known concentrations of L-Prazolam. There was a blank that had no L-Prazolam in it, a control that had some in it. There was the sample, and then to confirm whatever the result was with the sample, there was a dilution of the case sample also tested. The machine was set up only to look for L-Prazolam. It wasn't looking for anything else that could have that metabolite from the urine. It wouldn't have detected a different molecule. And L-Prazolam was not found in the blank, which was one of the performance checks. It was in the control. And the six standards that were tested all generated a very linear standard curve, so the data points fit what would have been expected to fit. So with the control, the blank, and the standards all set up, the sample had L-Prazolam and also the dilution of the case sample also had L-Prazolam. All that needed to be shown was any amount. If a specific amount was required, then there wouldn't have been enough evidence to prove a specific amount. But the reason she – she didn't say that there was zero. Under 12.5 micrograms per liter didn't mean zero because she said it's present with a reasonable degree of scientific certainty. The reason – She said that it was within a margin of – She said within an amount under 12.5 micrograms per liter. And the reason that it's something under that amount was because the lowest concentration that was run as a standard was 12.5 micrograms per liter. That turned up as a result of the data point that she plots for the linear regression is the ratio of the drug peak for the concentration against an internal standard, and that number was 2.775 for the 12.5 micrograms per liter concentration. The result for the sample was 2.771. So it is for – very close to the 2.775. It's from just under the lowest concentration tested, but it is admittedly under that lowest concentration tested. So that's why she ends up reporting it in an amount under that amount. But that's more than zero. She doesn't say it could be zero. And that's because, as compared to the blank, the results for the blank, she could tell that it wasn't just background noise in the sample, that the drug peak was significant, and it was something probably pretty close to the 12 micrograms per liter. So she did know it was present, even if she couldn't state the particular amount, because she hadn't tested any – If she had tested, let's say, 5 micrograms per liter, and then there had been more information on what the amount would be on the lower end of the spectrum, then she would have been able to say it was over that. But because it was under the lowest one, she couldn't, even though it was really close. But all it needs to have been is present, and she did say that it was present within a reasonable degree of scientific certainty. Getting there to the degree of scientific certainty, she testified in order to find the foundation for the evidence of the test, very little about whether there would have been any scientific reliability established in the community. She said that it was acceptable, or we wouldn't have put it into our lab. And then, did she testify to any publications or any other labs that had used this, or any vetting of this test? Well, I would disagree that there wasn't evidence of vetting of the test, because she did testify that using the LC-MS machine to determine the amount of alprazolam in the blood was a published method. She did testify that it was scientifically acceptable with scientific literature approving such use. She testified that it was included in the manual of the equipment that came with the solid phase extraction tubes, and that she was allowed to use it at the time. She did discuss it with her supervisor. She was extensively trained on the machine, including proficiency tests. But if the machine couldn't be used to identify alprazolam, then the manual from the machine wouldn't have included the way to do it to test for alprazolam. I don't think that's the question. I'm not asking you the question about whether or not this could test for that substance. It's whether or not this test has been deemed to be reliable within the scientific community, such that it is something that has reached general acceptance. She did testify that it was generally accepted in the scientific community, and that it was a published method, and that there was scientific literature approving the use of it. Why don't you use it now? I think that there's a difference in this case between what the lab protocols are versus whether it's accepted in the scientific community. Sure, there were some lab protocols that weren't followed, but that doesn't mean that the test still wasn't reliable. It was published. It was included in the equipment manual. And we know that it worked because the performance checks showed that it did. It was the perfectly linear standard curve. It wasn't in the blank. It wasn't both the sample and the dilution. So it's not used now because it's not in the lab's manual, but the exclusion from the lab's manual doesn't mean that it's not a published method in the scientific community generally. Do we know why it wasn't included? No. We don't know why. We can only speculate on whether they didn't agree with the instruction. No, no. And I would say that there's indication it's not because they didn't agree with it, because she did testify that it was included in the equipment manual for the piece of equipment used. She did discuss that with her supervisor, and that she wouldn't have used it if it wasn't, you know, it did have the performance checks to make sure that it worked. So you're saying that that is the scientific reliability necessary to deem something as an acceptable test, just because it... I think with her testimony that this was a published method, it was included in the tube's manual. And the court ruled that that was not sufficient. The foundation objection that was made was sustained because the judge didn't know what test they were talking about specifically. There had been a bunch of tests on the urine and a bunch of tests on the blood. It was then clarified that the test they were talking about in terms of talking about the scientific acceptability was quantitating the L-perazolam in the blood. So I believe that with that as the context, there was the testimony about its acceptability to quantify the L-perazolam in the blood. I think the foundation objection was just what test are you talking about. Okay. I can try to simple... I have to think simple. But in any test, there's a concept of validity and then reliability. Sure. So they always get confused. Reliability is giving the same measurement repetitively. It has nothing to do with validity as to whether it's actually identifying the substance properly and accurately. What you're saying is that she did samples, some without Xanax, and then a blank one that clearly was not contaminated with any substance. Yes. So that she was doing that to assess validity as primary, I assume. Yes. That the test machine could pick up the presence of Xanax in the blood substance. Because we're only talking about blood here. Yes. And you're saying that she testified that indeed it did pick up Xanax in the one or two or how many samples that the known Xanax was put in. Yes. Whereas one that had no Xanax did not show the presence of Xanax. Correct. And so you're saying that goes to the validity of the ability to get to the substance to identify it. Yes. Okay. Now, that's what she has done for her own validity test, right? Now, where is there in the scientific community to support what she did, that that is indeed a valid test? Well, she said she followed the procedures that were published and included with the tubes. So all the procedures are all published and we use the legal term if they're printed and disseminated. Well, she also testified that the method she used was scientifically acceptable and that in the scientific community. Did she give anything further than that? She didn't give any more specific citations. Like what was she relying on, the treatises or anything like that? She didn't have any specific citations that she gave for that, no. Okay. Is that necessary to you? Well, I don't view the objection having been. The defendant, even in the reply brief to the corrected brief, says we're not talking about whether this machine generally is accepted or not. I'm just talking about whether it's used to identify that particular molecule as acceptable. But I interpreted the testimony in the context of talking about the specific test performed, being the test to identify aprasalam in the blood. That was the background for when she did testify that the method she used was scientifically acceptable. I believe it covered that specific use. And if it didn't, that she didn't go and say specifically with aprasalam. And again, I interpret the testimony as covering that. Then I don't see an objection that said, okay, we have this generally, but we need more on this specific aprasalam itself. So I think the parties, it seemed to me that everyone understood they were talking about that specific test for that specific molecule. But if not, then I didn't see anywhere where a more specific foundation would have been requested. Okay. Now let's talk about quantification or quantitative analysis. Sure. Is that where we're talking margin of error? The quantity, that it's this amount within a margin of error, plus or minus? Or are we talking about the existence of it within the margin of error? It's the how much. It's the how much. The how much. So she testified it was definitely there, but she couldn't say the how much within the – she couldn't say the how much aspect. This margin of error, which could go to zero, theoretically, to some other higher quantity, or to some higher level, is just a quantity. It's just a quantity. It's not the yes, no. And so I don't believe it could go to zero. Would it be inconsistent if margin of error was zero? If she said that it could have been nothing, then sure, that would be a problem. But she said it was definitely present in some amount, and that amount was under 12.5 concentration of the micrograms per liter. Which they said is below the therapeutic level. Yeah, but it didn't go all the way down to zero, because she does testify specifically that it's present. It is present. And I'd say the upper limit would have been the 12.5 too, because the result was under the amount for that one. So you're saying that's sufficient to sustain the charge beyond a reasonable doubt? Yes. Well, her ultimate conclusion was that alprazolam was present within a reasonable degree of scientific certainty. So the judge could then weigh that and determine that that was sufficient to base the finding of alprazolam in the blood. Counselors, are there any further questions? Thank you. Thank you, Your Honors. Mr. Snyder for rebuttal. Justices, if I may, I'd just like to address one thing. It wasn't really hit on other than in the State's reply brief, but if I could hit on it briefly. And that's the issue of the standard of review in regards to one of our claims that there was inadequate foundation and that the testimony should not have come in at all. And I would highlight and refer you to the Stafford case, which was briefed. It is contained, I believe, if I'm not mistaken, it's in the second reply brief by defense counsel, if I'm not mistaken. That's 392LF3212. The pages I'm directing the Court's attention to are 221 to 222. And if I could state in pertinent part, it is left to the discretion of the trial court to determine whether an expert's testimony may be properly admitted. However, the admission of an expert's testimony requires the proponent to lay an adequate foundation, establishing that the information upon which the expert bases his opinion is reliable. It is a function of the trial court to determine whether the foundational requirements have been met. That determination presents a question of law. We review the defendant's claim to no vote. That's what we're asking the Court to do today, and I ask that you reject the State's argument that it should be an abuse of discretion standard. Thank you. Mr. Snyder, I believe there are some questions for you. Okay. So take that quote, okay, apply it to this case. What is missing from the State's case, from your perspective, as to what they've misused, reliable, but it should be validity. That's what we're going after. I'm looking at it in a totality, not just one thing. It's several balls being dropped, and if I could point to it, just the wrong test, assuming the presence of the controlled substance when using a test to weigh the controlled substance when there may not have been a controlled substance at all, not following your own lab's procedure manual, not being able to, after testifying that this is used in the scientific community, not being able to actually say what publication this came from, in support of one's expert opinion. That's like saying that, yes, thou shalt not kill is contained in the Ten Commandments, but when you ask them what are the Ten Commandments, they can't say anything else. They can't say, oh, anything. Saying something doesn't make it true, is my point. And that's the problem with this expert's testimony. I'll just simplify it again. The machine is there. There's a manual that says, oh, if you want to test for Xanax, here's what you do. And that's all we have is a machine that says you can do that. But don't we have more than that? Well, the problem is that we have the laboratory's procedure manual saying you don't use that machine for that test. So even if you're following that, you haven't followed the proper protocol for using even the correct test, assuming that the other tests were correct, which we have the urine test saying that we have a metabolite of what may or may not be. I think the blood is the one that's the hardest one for you. Yeah. So let's focus on that one. Yeah. So you have a known substance of Xanax that's present in a sample, one that is not present, and the light goes off when it gets over Xanax, but it doesn't when it goes over the absence of Xanax. Is that not sufficient? According to the defense's expert, that test, the one with blood, there was no blood test to identify the actual substance. It was only to quantify the substance. Okay. So she was using as her basis for the quantification test the urine test. Okay. So that's something that the court should consider. But can you measure? So there was no actual identification of Xanax in the blood test? Yeah. And that goes back to my apples and oranges analogy. They're weighing the fruit, but they don't know which fruit for sure that they're weighing because they used the urine test to figure out which fruit it was, except they didn't figure out which fruit it was. Okay. I don't see any other questions. Thank you, Mr. Snyder. And thank you both for your arguments here today. This matter will be taken under advisement and a written decision will be issued to you as soon as possible. And right now I'm going to stand in a brief recess for panel change. Please rise. This court stands in recess.